MARY ELLEN TURNER et al., Appellants, v. JESSE LAMBERT et al., Appellees.

**TRUSTS:  Resulting Trusts—Conveyance to Wife.**  A presumption of gift to a wife arises from the fact that a husband contracts for land, pays the purchase price himself, and causes the legal title to be taken in the name of the wife.  Evidence held quite insufficient to overcome the presumption.

*Appeal from Harrison District Court.*—EARL PETERS, Judge.

JUNE 24, 1924.

Rehearing Denied September 20, 1924.

Suit in equity, to establish a resulting trust in certain real estate in favor of D. W. Lambert, as *cestui que trust*. The contending parties comprise the widow and children of the said D. W. Lambert, deceased. There was a decree dismissing the petition and confirming title in the defendants. The plaintiffs appeal.—*Affirmed.*

*Holly & Holly* and *Floyd W. Elston,* for appellants.

*P. E. Roadifer* and *Bolter & Murray,* for appellees.

Evans, J.—I. Plaintiff Sarah Lambert is the surviving widow of D. W. Lambert. The other plaintiffs are four of his children. His other children are defendants Jesse Lambert and Albert W. Lambert. Defendant Detwiler is a purchaser of the land in controversy from his codefendants. In December, 1899, D. W. Lambert purchased a farm of 120 acres, situated in Harrison County, and took 'title thereto in the name of his wife, Ida. In 1904, the wife, Ida, died testate. By her will, she bequeathed to her husband all of her personal property and a life estate in said farm, with power of sale, with the remainder in fee to the defendants Jesse Lambert and Albert W. Lambert. This will was duly probated, without challenge. In 1906, D. W. Lambert executed a quitclaim deed to Jesse and Albert W. Lambert, wherein he purported to confirm the disposition made by the will of Ida, and to reserve to himself the life estate in the farm, and to relinquish all claim of dower interest. The defendant Albert Lambert was the only child of the marriage of D. W. Lambert to his wife Ida. The others were the children of a prior marriage. In 1907, D. W. Lambert married a third wife, from whom he obtained a divorce the following year. In 1913, he married the plaintiff Sarah Lambert. He died in December, 1918. The plaintiffs herein claim an interest in the property in controversy, as the surviving widow and children of D. W. Lambert. They necessarily claim that he was the owner of such property at the time of his death.

Concededly, the deceased wife, Ida, held the legal title of record. Concededly, also, D. W. Lambert had never held the legal title, either before or since the death of the wife, Ida.

The plaintiffs in their attack are confronted with two lines of fortification: the first being the will of Ida, and the second being the quitclaim deed and confirmation of the disposition of such will, made by Lambert after the death of his wife.

As to the disposition made by the will, the line of attack is that Lambert, and not the wife, Ida, was the real owner of the farm at all times since the acquisition thereof, in that: (1) The wife, Ida, obtained the legal title through coercion and duress over her husband, though he alone paid the purchase money therefor; (2) that the wife, Ida, therefore, held the legal title in trust for her husband, who had paid the purchase money therefor.

Lambert and the wife, Ida, were married in 1890. At that time, he was a widower, with five young children, ranging in age from fourteen years down. Of these, plaintiff Mary Ellen Turner was fourteen years of age, and the defendant Jesse Lambert was twelve years of age. The husband manifestly had very limited means, and was living on a rented farm. Immediately after the marriage, he rented and moved upon a farm of 600 acres, located in Woodbury County, and there continued until the year 1902. Of his children of the first marriage, his son Jesse alone remained with him throughout that period. He worked without wages. Albert was born in 1891. The wife, Ida, contributed to the common resources the sum of about $200 inherited by her from her father's estate about 1896. The purchase price of the farm in controversy was $3,000, of which $1,200 was paid at the time of purchase, and a mortgage of $1,800 was given for the balance. The money paid therefor was all acquired through joint labors of the husband and wife and the two sons, and from such property as was contributed to the common resources by husband and wife, respectively.

Assuming, however, that the legal title and ownership of all the money so paid was in D. W. Lambert at the time of the purchase, yet the taking of title by him in the name of his wife presumptively conferred upon her the full legal and equitable

ownership thereof. Such a transaction, as between husband and wife, does not create a resulting trust in favor of the husband, as having paid the purchase price. Where the wife is made a grantee, under such circumstances, the husband is presumed to have intended a gift to or settlement upon her, and such presumption can be overcome only by very clear and "practically overwhelming" evidence. The law on that subject is well settled in this state. *Hayes v. Dean,* 182 Iowa 619; *Wright v. Wright,* 189 Iowa 921; *Hoon v. Hoon,* 126 Iowa 391; *Mullong v. Schneider,* 155 Iowa 12.

The principal evidence relied on by plaintiffs for such purpose herein is that of plaintiff Mary Ellen Turner and her husband. This is, in substance, that, for many years, Mrs. Lambert had repeatedly told her husband that, if they should ever buy a farm, the title must be taken in her name; and that, in the event of his refusal to do so, she would obtain a divorce from him; that she was cross to him; that she was cross to his children; that she meddled in his business affairs, and asserted her will. To corroborate this contention, plaintiffs called several friendly witnesses, not parties litigant. The following excerpts will be sufficient illustration of the nature of such testimony.

Mrs. Viola Ely testified:

"I have seen his wife and him together, and I have noticed something peculiar in regard to her conduct toward him. She acted as though she wanted to have more to say about the business affairs than really a woman should have, when they would be talking their business affairs over with the friends and neighbors. At times, she would take the conversation *out of his hands.* I don't remember very many business conversations, but I do remember a few. In regard to buying land, she always wanted to have her say about it. Seems as though Mr. Lambert would have to listen quite a bit to what she said. I remember about their looking at some Tennessee land. She seemed willing to go to look at it, but when they came back, she said she wouldn't let Mr. Lambert buy, and they did not buy. Mr. Lambert always seemed very easy to get along with—seemed to be very easily influenced in his home. * * * As to Mrs. Lambert's treatment, I never noticed the boys, but I know she was not as

good as she should have been to Rose. I know she did lots of work, because I have been there when she was working, and she was good to work. Yes, Rose was good to work; she worked for me one time for three weeks. Rose never acted like she had a pleasant time at home; and I have heard her get scoldings that didn't seem like it.''

T. S. Ely testified for plaintiff as follows:

''Yes, sir, he was a good business man; he looked after his own affairs, and did it well. That was especially noticeable during the time I knew him. There was hardly a day that I was not on the farm, for five years. * * * I never knew anything about Mrs. Lambert's dealings with regard to Mr. Lambert's business affairs. I never knew of the way she acted in regard to the Tennessee land. I could hardly say that I was ever present when Ida I. Lambert and D. W. Lambert talked over business matters. As to her treatment of the children, I guess Rose Lambert didn't get along so well. I know she came up and worked for us, and she wasn't satisfied at home, very well; that is about all I can say in regard to that.''

A. M. C. Thompson testified for plaintiff as follows:

''Yes, sir, I knew Mrs. Ida I. Lambert. She was a pretty fair-looking woman. She was rather fleshy and short and heavy,—a large, heavy woman. I observed the treatment of one of the children. I considered that Rose was not treated as good as she might have been. I thought the child had a very hard time of it, for a girl of her age; I thought there was too much work put on her. I thought they worked her pretty hard. I saw Mrs. Lambert quite frequently, probably once a week, on an average. I saw her in company with her husband more often than any other way. I never saw anything out of the way in their everyday life. Yes, there was a time during threshing when she got on her ear a little too much, for a woman. We were threshing at Mr. Lambert's. The threshing machine was there, and we were hauling grain from the stack,—that is, to the barn and granary,—and I and this D. W. Lambert was doing the hauling or shoveling off; and we was there at the barn, shoveling the wheat off, and the machine set fire to some of the stacks; and of course we was half a mile from the stacks,—

we couldn't do anything; and Mrs. Lambert came out, in a great furor. I don't know but any other woman would have done the same; but she wanted him to get a move on him, he 'never done anything, anyhow,' and it was time for him 'to get up there and do something.' That is all I ever saw. I thought she was a little out of sorts. She said it right in my presence. That was where I heard it. She wasn't close to me. She was excited, of course. D. W. Lambert made no reply at all. He was just silent.''

The foregoing is the strongest corroborating evidence produced from disinterested witnesses. It tends to contradict, rather than to corroborate.

Mrs. Lambert was not present during any of the negotiations for the purchase of the farm, and was not present when the conveyance was made to her. All that was done in her behalf was so done in her absence, by her husband alone. The family moved upon the farm in 1902. Mrs. Lambert died there in 1904. The surviving husband lived for 14 years thereafter. He was the executor of the will. He never challenged the disposition made by the will. On the contrary, he expressly confirmed it. The record discloses substantial reasons why the defendant Jesse Lambert should have been favored by the will of his stepmother over his brother and sisters of the first marriage. He was the only one of the children who had aided substantially in the acquisition of the means for the purchase of the farm.

A careful reading of the evidence satisfies us that the plaintiffs have clearly failed to sustain their attack upon the validity of the title of the testatrix, Mrs. Lambert. If it should be said that her conduct toward her husband was at times fairly subject to criticism, yet it fell far short of coercion, in any legal sense. Still less does it appear that her blamable conduct, if any, was a controlling influence in the acquisition of this title.

II. Plaintiffs' other line of attack is upon the quitclaim deed. Their contention is: (1) That such deed was never signed by Lambert; (2) that it was never delivered. Our conclusion in the foregoing division of itself renders this point unavailable to the plaintiffs. Sufficient, however, to say that the attack thus made is unwarranted by the record. Such deed was

signed and acknowledged before a notary public, who is concededly reputable, and who was produced as a witness upon the trial. The deed was drawn by him *in toto*. That the same deed was deposited for safe-keeping by Jesse Lambert, some years before the death of his father, and was obtained by him from the depositary bank after the death of his father, is proved beyond all cavil, by witnesses who have no interest in the controversy.

The contrary evidence for the plaintiffs is that of the surviving widow and her daughter, to the effect that they saw this paper among the papers of the decedent, and delivered the same, with other papers, to the administrator of the decedent, and that such paper was at that time unsigned. Nonexpert witnesses were also produced to testify to their opinion that the signature on the paper was not that of the decedent. To put it kindly, these witnesses were clearly mistaken. We think no disinterested person could read this record and give any credence whatever to the alleged identification of this instrument by this mother and daughter. The evidence is not close or doubtful at this point, but is overwhelming in support of the instrument and its delivery.

The decree of the trial court was clearly right, and is, accordingly, affirmed.—*Affirmed.*

ARTHUR, C. J., PRESTON and FAVILLE, JJ., concur.